UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ARQUELIA VEGA,

                Plaintiff,

– against –

DEPARTMENT OF EDUCATION, and
ESTER QUINONES,

                Defendants.

**<u>OPINION & ORDER</u>**

18CV6221 (ER)

<u>Ramos, D.J.:</u>

      Arquelia Vega ("Plaintiff" or "Vega") brings this action *pro se* against the Department of Education ("DOE") and Ester Quinones ("Quinones"), a school principal (collectively, "Defendants"). Vega is a former DOE teacher who claims that school administrators did not accommodate her disability and retaliated against her for filing a claim with the Equal Employment Opportunity Commission ("EEOC") via the New York State Division of Human Rights ("NYSDHR"), among other adverse employment actions. Vega asserts claims under the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 to 796 ("Rehabilitation Act"), the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 to 12213 ("ADA"), New York State Human Rights Law, N.Y. Exec. Law §§ 290 to 297 ("NYSHRL"), and the New York City Human Rights Law, N.Y. City Admin. Code §§ 8-101 to 131 ("NYCHRL"). Doc. 31. Defendants now move to dismiss her Amended Complaint in its entirety. For the reasons set forth below, the Defendants' motion to dismiss is GRANTED.

# I.    BACKGROUND

## A.  Vega's Employment at P.S. 50

Vega is licensed as a teacher by New York State.  Doc. 31, 10.  She suffers from obesity and cardiomegaly, an enlarged heart, which has resulted in significant limited mobility and difficulty breathing while conducting everyday activities, such as walking and climbing stairs.  *Id.* She currently uses a motorized scooter.  *Id.*

In September 2014, Vega began working as a substitute Spanish teacher at P.S. 50 in Manhattan.  *Id.* at 11.  Her classroom was located on the third floor.  *Id.*  At the time, she did not need a mobility device to get around but had difficulty using stairs.  Climbing the three flights of stairs caused her to wheeze and it could take her several minutes to catch her breath.  *Id.*  On occasion, Vega borrowed keys to the elevator from staff members that had access.  *Id.*  Vega asked the assistant principal for an elevator key because of her disability, and he supplied her with a key after she provided medical documentation.  *Id.* at 12.

In October 2014, Vega secured a probationary teaching position at P.S. 50 and had a first-floor classroom.  *Id.*  Among her responsibilities, Vega had to escort her students to their other classes, which were located on different floors.  *Id.*  To do so, Vega would take the elevator and meet her students on the appropriate floor.  *Id.*  In January 2015, the school hired a new principal, Quinones.  *Id.*  A month later, in February 2015, Vega attempted to accompany her students on a class trip but fell behind while the group was walking to the subway because of her disability.  *Id.*  Quinones allegedly forced Vega to abandon the trip and take a cab back to the school. *Id.*  A few days later, Vega misplaced her elevator key and asked the assistant principal for a replacement.  *Id.*  The assistant principal directed her to ask Quinones, who refused to give Vega a key for the elevator.  *Id.*  Allegedly, Quinones said that she did not want Vega working at the

school anymore and wanted her to look for a new job because her health was interfering with her job: "Well Ms. Vega, I don't want you here. I want you to go to 'open market' for a new job. Your health is interfering with you doing your job." *Id.* at 11.

Vega alleges that on March 13 and May 18, 2015, she petitioned the DOE's medical unit for an elevator key to accommodate her disability.[1] *Id.* Vega further alleges that the unit never responded to her request.[2] *Id.* Allegedly, Quinones told Vega that she knew about her key request to the DOE but still refused to give her one. Doc. 31, 12. For the remainder of the year when Vega could not borrow an elevator key from other staff members, she took the stairs, which caused her heart palpitations, chest pain, and shortness of breath.[3] *Id.* Quinones observed one of Vega's lessons in April 2015 and gave her a developing score[4] for the 2014–2015 school year, Vega's first year in a full-time teaching position. *Id.*

In June 2015, Vega discovered that she had been assigned to a classroom on the third floor for the 2015–2016 school year. *Id.* Vega and Quinones met with a union representative to discuss making an accommodation for Vega and she was reassigned to a classroom on the first floor. *Id.* Allegedly, during the summer of 2015, the assistant principal called Vega four times and asked her when she was going to leave the school and told her Quinones wanted Vega to leave because she was not doing her job effectively. *Id.*

---

[1] Contrary to the allegations in the Amended Complaint, a copy of the accommodation request she made on May 18, 2015, shows that she asked to not be assigned to school trip duties because of her asthma and ongoing physical therapy. Doc. 44-3, 9.

[2] The 2007 NYSDHR's decision notes that, in fact, the unit denied Vega's requests because she did not provide them with the medical documentation they requested. Doc. 44-4, 3.

[3] The NYSDHR decision states that all staff had free access to the elevator. Doc. 44-4, 4.

[4] Teachers receive a "developing rating" after an annual performance review when their results are below the state average for similar students or below district-adopted expectations for growth or achievements. N.Y. Educ. Law § 3012-c (McKinney). Following a developing rating, the school district or board of cooperative education services formulates an improvement plan for such teacher. *Id.*

Vega returned to P.S. 50 at the start of the school year in September 2015. *Id.* at 13. Allegedly, as a result of poor performance the previous school year, Vega was provided with a Teacher Improvement Plan, which provided specific directives to improve her performance in areas of concern, such as planning and implementing effective lessons. Doc. 44-4, 3.

On the first day of school, Quinones allegedly confronted Vega about going to the DOE medical board in the spring of 2015 and also yelled at her publicly for arriving late to the school assembly. *Id.* Vega and three other teachers, who upon information and belief were not disabled, arrived late because they were unclear where to report. Allegedly, Vega was the only teacher who received a disciplinary letter for being late. *Id.*

Vega notes that the elevator was unlocked at the beginning of the 2015–2016 school year and that she could access it as needed. *Id.* at 12. But Vega's co-teacher, Ms. Douglass, told her that Quinones wanted Vega to accompany her students up and down the stairs between classes. *Id.* At the end of September 2015, she was moved to a second-floor classroom. *Id.* In September and October 2015, Quinones observed Vega in two different classes and gave her negative performance evaluations. Doc. 44-3, 6. On October 28, 2015, Quinones requested a medical evaluation for Vega, pursuant to New York State Education Law § 2568, to determine her physical capacity to perform her job duties. Doc. 44-3. Vega was cleared to work. But between September 2015 and December 2015, she received 14 written disciplinary warnings from Quinones, for various reasons such as tardiness, yelling at students, and using other teachers' lesson plans.

On November 19 or 20, 2015, the elevator was turned off and the janitor told Vega that Quinones had instructed him to do so. Doc. 31, 14. On November 23, 2015, Vega walked down the stairs from her second-floor classroom to attend a disciplinary meeting with Quinones

concerning an allegation of verbal abuse made against Vega.[5] *Id.*; Doc. 44-3, 10. However, rather than meet with her then, Quinones asked Vega to come back in 30 minutes. Doc. 31, 14. Allegedly, this happened 7 more times on the same day. *Id.* Each time Vega had to walk up and down the stairs she struggled to breathe and became anxious. *Id.* In order to avoid unnecessary trips, Ms. Douglass advised Vega to call Quinones' office before going down, but Vega did not do so because she "was afraid." *Id.*

The following day, Vega collapsed at school and was taken to a hospital by ambulance. *Id.* For approximately fourteen months, from November 24, 2015 to February 15, 2017, Vega took medical leave from teaching and spent time in a nursing home due to her physical ailments and in a psychiatric treatment center. Doc. 31, 14. Vega alleged she was suffering from nightmares about Quinones and insomnia because she was afraid to fall asleep. *Id.* On October 14, 2016, while on leave, Vega asked the DOE to reassign her to a different school, citing her disability, the difficulties getting around the school, and Quinones' bad treatment. *Id.* The request was denied. On October 28, 2016, also while on leave, she filed a complaint with the NYSDHR wherein she alleged, *inter alia*, that Quinones discriminated against her by telling her to quit, refusing to give her an elevator key, issuing disciplinary letters against her, and giving her negative performance evaluations. Doc. 44-3. The NYSDHR denied her complaint in April 2017 as they found no probable cause for her allegations. Doc. 44-4.

Vega returned to teaching on February 15, 2017 and at this time required a walker to assist her with mobility. *Id.* at 15. Vega was assigned to co-teach four different classes, all on the first floor, however she still had difficulty travelling from classroom to classroom because she

---

[5] Some of the disciplinary warnings that were filed against her stated Vega yelled at her students, but Vega alleges that while she sometimes spoke sternly, she did not yell at them. Doc. 31, 13.

had to transport all of her supplies and lesson plans.  *Id.*  In the first week of March 2017, Quinones issued Vega a disciplinary letter for allegedly using two of her colleague's lesson plans without permission; Vega denies these claims.  *Id.*  Subsequently, Vega was forced to switch from co-teaching four general education classes to co-teaching a special education class, which restarted her probationary period.  *Id.*

On or about March 17, 2017, Vega received notice of a meeting with Quinones and a union member regarding the lesson plans.  *Id.*  When she learned that the meeting was about the allegedly stolen lesson plans, a charge she vehemently opposed, Vega states she "had a breakdown in the main office" where she experienced symptoms of post-traumatic stress disorder and could not attend the meeting.  *Id.*  Vega allegedly screamed and cursed in the main office, fell to the floor, and then called the police.  Doc. 44-6, 4.  Later, after a hearing, the union determined that Vega had not stolen the lesson plans and, as Vega was leaving the hearing, Quinones allegedly said, "Don't worry there's a lot more."  Doc 31, 15.

On May 17, 2017, Vega's request to the DOE to be transferred to a building with an elevator was denied as "not medically warranted."  *Id.* at 16.  That same month, Quinones was replaced by Ellen Johnson ("Johnson") as principal of P.S. 50.  *Id.*  At the end of the 2016–2017 school year, Vega received an unsatisfactory rating and the DOE informed her that the rating was the result of observation by the principal.  *Id.*

However, Vega states she was never observed by any principal that year and that the observation forms attached to her rating were blank.  *Id.*  Johnson said the rating was based on Quinones's evaluation.  *Id.*  Vega approached the DOE again with the help of her union and the DOE conducted an inquiry into her unsatisfactory rating.  *Id.*  Vega asserts that in 2018, the DOE told her she had received the unsatisfactory rating because of the March 2017 breakdown and left

the unsatisfactory rating in place.  *Id.*  However, the NYSDHR report from 2018 asserts that according to the DOE, Vega received the unsatisfactory rating due to her "poor attendance, deficient lesson planning, and unprofessional behavior."  Doc. 44-6, 4.

For the following school year, 2017–2018, while Johnson was principal, Vega earned an "effective" rating as a teacher.  Doc. 31, 16.  On December 14, 2017, Vega filed a second charge with the NYSDHR alleging that Quinones discriminated against her by refusing to provide her with an elevator key and issuing her an unsatisfactory rating.  Doc. 44-6.  At the end of the school year, P.S. 50 closed and Vega joined the Absent Teacher Reserve ("ATR"), awaiting placement at another school.

### B.  Vega's Employment at P.S. 146

Vega was eventually placed at P.S. 146, under the same superintendent as P.S. 50, Alexandra Estrella ("Estrella"), who Vega alleges had a very close personal relationship with Quinones.  *Id.*  By that time, Vega's mobility had deteriorated to the point that she needed a scooter to get around.  *Id.*  In order to enter and leave the building, she had to use a side entrance because the main entrance was not accessible.  Doc. 36.  Vega says she frequently had to find a safety officer, security guard, or paraprofessional to help her through a locked side door.  *Id.*  She also had difficulty carrying all of her teaching materials and would stay after school past 6 P.M. to complete her lesson plans despite a rule that all teachers had to leave the school by 6 P.M.  *Id.*  Vega received several warnings about staying past 6:00 P.M.  *Id.*

Vega claims that she "worked diligently to finish her lesson plans by 6 pm [*sic*] every evening."  *Id.* at 17.  If she was a few minutes late in leaving the school premises, she says, it was because the custodial staff would pile trash by the elevator, and it had to be moved in order for her to access the elevator.  *Id.*  Vega states that the school was aware of her difficulty in

completing her duties in time but did not offer her any accommodations to allow her to easily transport her materials.  *Id.*

In September 2018, Vega requested a safety room during fire drills, but the school did not accommodate that request.  Doc. 36.  During a subsequent fire drill, she suffered an asthma attack while walking with her students and was treated by ambulance.  *Id.*  On February 4, 2019, Vega fell in the school library and hit her head.  *Id.*  She became unconscious and was taken by ambulance to a hospital, resulting in her taking off several weeks from school to recover.  *Id.*

On February 19, 2019, while still on leave, Vega received a letter from Estrella stating that she intended to terminate Vega for various reasons including, leaving the building late, the tardy submission of a disabled student's Individual Education Plan ("IEP"), and using maps in the classroom that had text that was too small.  *Id.*  The letter also mentioned Vega's 2017 breakdown.  *Id.*  The letter informed her that she could rebut the claims in the letter and that a determination about her continued employment would be made on March 14, 2019.  *Id.*  Vega's new teacher probationary period was set to expire on March or April 2019.  *Id.*

On or about March 5, 2019, Vega submitted a letter to the school board disputing the claims in Estrella's letter.  *Id.*  On March 11, 2019, Vega visited the DOE on another matter and was told she had been terminated.  *Id.*  Vega does not know why the termination decision was made before the March 14 date and believes it is part of an ongoing retaliation campaign stemming from her multiple requests to obtain accommodations for her disability.  *Id.* at 17–18.

Vega filed her initial Complaint on July 9, 2018.  She amended it on May 6, 2019, alleging the following adverse employment actions:  (1) termination, (2) failure to accommodate disability, (3) disparate treatment than similarly situated employees, (4) retaliation, and (5) harassment.  Doc. 31, 5.  On August 23, 2019, Defendants filed a motion to dismiss alleging that (1)

Vega's NYSHRL and NYCHRL claims are partially barred by the election of remedies doctrine, (2) Vega's ADA and Rehabilitation Act claims are barred by the applicable statute of limitations, (3) Quinones is not an appropriate party, and (4) the Amended Complaint fails to state a plausible claim of discrimination, hostile work environment, or retaliation.

## II.  LEGAL STANDARD

When ruling on a motion to dismiss pursuant to Fed. R. Civ. Pro. 12(b)(6), district courts are required to accept as true all factual allegations in the complaint and to draw all reasonable inferences in plaintiff's favor.  *Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013).  However, this requirement does not apply to legal conclusions, bare assertions, or conclusory allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 681, 686 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  A plaintiff is required to support his claims with sufficient factual allegations to show "more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed."  *In re Express Scripts Holding Co. Secs. Litig.*, No. 16 Civ. 3338(ER), 2018 WL 2324065, at *6 (S.D.N.Y. May 22, 2018) (quoting *Twombly*, 550 U.S. at 570).

Moreover, while a *pro se* plaintiff is permitted certain leeway, a court will still require that he plead facts sufficient to "state a claim to relief that is plausible on its face."  *Teichmann v. New York*, 769 F. 3d 821, 825 (2d Cir. 2014) (citing *Iqbal*, 556 U.S. at 678).  *Pro se* litigants' submissions are "held 'to less stringent standards than formal pleadings drafted by lawyers.'" *Hughes v. Rowe*, 449 U.S. 5, 9 (1980) (per curiam) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)); *see also Young v. N.Y.C. Dep't of Educ.*, No. 09 Civ. 6621 (SS), 2010 WL 2776835, at *5 (S.D.N.Y. July 13, 2010) (noting that the same principles apply to briefs and opposition papers filed by *pro se* litigants).  Although "*pro se* status 'does not exempt a party from compliance

with relevant rules of procedural and substantive law,'" *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 477 (2d Cir.2006) (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)), courts read the pleadings and opposition papers submitted by *pro se* litigants "liberally and interpret them 'to raise the strongest arguments that they suggest.'" *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (quoting *Whitley v Albers*, 475 U.S. 312, 319 (1986)).

## III.  DISCUSSION

### A.  NYSHRL and NYCHRL Claims

Vega's claims under the NYSHRL and NYCHRL that occurred prior to December 14, 2017, are barred by the election of remedies doctrine.  The NYSHRL and NYCHRL each contain an "election of remedies" provision that "precludes a plaintiff from pursuing her discrimination claims in a court of law when the same claims were previously brought before a local administrative agency."  *See DuBois v. Macy's Retail Holdings, Inc.*, 533 F. App'x. 40, 41 (2d Cir. 2013); N.Y. Exec. L. § 297(9) (stating person claiming unlawful discriminatory practice shall have cause of action "unless such person had filed a complaint hereunder or with any local commission on human rights"); N.Y.C. Admin. 9 Code § 8-502(a) (same regardless of whether it was city or state division of human rights).  In other words, a plaintiff seeking to bring a discrimination claim under the NYSHRL or NYCHRL is given a choice:  she can either proceed in court or pursue an administrative complaint before a local human rights commission, but she cannot do both.  *Levi v. RSM McGladrey, Inc.*, 2014 WL 4809942, at *9–10 (S.D.N.Y. 2014).

There are two exceptions to the election of remedies rule.  *See Skalafuris v. City Univ. of N.Y.*, 2010 WL 1050299, at *2 (S.D.N.Y. 2010), *aff'd sub nom. Skalafuris v. City of N.Y.*, 444 F. App'x 466 (2d Cir. 2011).  The first exception applies when the NYSDHR dismisses the claim for administrative convenience, and the second applies when the claim is filed with the

NYSDHR only by way of an automatic referral from the EEOC. *See York v. Ass'n of the Bar*, 286 F.3d 122, 127 n.2 (2d Cir. 2002).

Neither exception applies here. In the instant case, Vega filed her complaints directly with the NYSDHR on October 28, 2016 and December 14, 2017, prior to bringing this federal lawsuit, and they were both dismissed for lack of probable cause, not for administrative convenience. Doc. 45, 9. Vega reiterates the same claims and factual allegations she raised in her NYSDHR charges, which were denied. Her election of remedies therefore divested this Court of subject matter jurisdiction over her NYSHRL and NYCHRL claims. Accordingly, these claims are dismissed with prejudice.

### B. ADA and Rehabilitation Act Claims

The ADA and Rehabilitation Act do not include an express statute of limitations, accordingly courts "must apply 'the most appropriate or analogous state statute of limitations.'" *See Purcell v. New York Inst. of Tech. - Coll. of Osteopathic Med.*, 931 F.3d 59, 63 (2d Cir. 2019) (applying New York's three-year statute of limitation in personal injury actions to ADA claims). Vega filed her complaint on July 9, 2018. Doc. 1. In her Opposition, she implicitly acknowledged that certain events are time-barred by the applicable statute of limitations. Doc. 48, 2 n.2. Accordingly, any ADA or Rehabilitation Act claims arising out of events prior to July 9, 2015 are barred by the applicable statute of limitations.[6]

Vega's remaining claims arise out of events that occurred while she was a teacher at P.S. 146 during the 2018–2019 school year. Specifically, that the DOE did not accommodate her request for a safety room during fire drills in 2018, that P.S. 146 did not accommodate her

---

[6] In New York, a plaintiff has 300 days from an allegedly discriminatory event to file a charge with the EEOC. *Harris v. City of New York*, 186 F.3d 243, 247 (2d Cir. 1999); *see also Stalter v. Bd. of Co-op. Educ. Servs. of Rockland Cty.*, 235 F. Supp. 2d 323, 332 (S.D.N.Y. 2002).

disability when she had difficulty leaving the building by 6 P.M., and the letter she received stating the DOE's intent to terminate her probationary employment.  Doc. 45, 6–7.  The Court will discuss these allegations in Section D *infra*.

## C.  Claims Against Quinones

All of Vega's claims against Quinones, based on the NYSHRL and the NYCHRL that occurred prior to December 14, 2017, are jurisdictionally barred by the election of remedies doctrine.  Doc. 31, 1–2.  *See Levi v. RSM McGladrey, Inc.*, No. 12-cv-8787(ER), 2014 U.S. Dist. LEXIS 134662, at *9 n.6 (S.D.N.Y. Sept. 24, 2014) (holding election of remedies doctrine applies "with equal force to any claims" against individual defendants).  Furthermore, it is well established that the ADA and Rehabilitation Act do not allow for individual liability.  *Nelson v. City of N.Y.*, No. 11 Civ. 2732 (JPO), 2013 U.S. Dist. LEXIS 117742, at *47 (S.D.N.Y. Aug. 19, 2013).  Accordingly, Vega's allegations against Quinones are dismissed.

## D.  Failure to State a Claim

### 1.  *Disability Discrimination*

The ADA prohibits employers from discriminating against a person on the basis of disability of such individual in regard to the "terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  To establish a *prima facie* case of disability discrimination under the ADA, a plaintiff must demonstrate that:  (1) his employer is subject to the ADA; (2) he is disabled within the meaning of the ADA; (3) he is otherwise qualified to perform the essential functions of his job with or without reasonable accommodation; and (4) he suffered an adverse employment

action because of his disability.[7]  *Rios v. Department of Education*, 351 F. App'x 503, 505 (2d Cir. 2009) (citing *Jacques v. DiMarzio, Inc.*, 386 F.3d 192, 198 (2d Cir. 2004)).

A plaintiff may raise an inference of discrimination by alleging actions or remarks made by her employer that clearly reveal a discriminatory animus, or by showing that similarly situated employees received preferential treatment.  *Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015).  The parties do not dispute that Vega has made a sufficient showing that she was disabled throughout her employment or that the DOE is subject to the ADA.  The Court's inquiry concerns whether Vega made a sufficient showing that, with reasonable accommodations, she could have performed the essential functions of her job and the DOE failed to provide her with appropriate accommodations.

### a.  Essential Functions of the Job and Reasonable Accommodations

A plaintiff bears the burden of production and persuasion on whether she is otherwise qualified for the job in question without assistance or that an accommodation exists that permits her to perform the job's essential functions.  *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 137–38 (2d Cir. 1995).  An individual is qualified for a job if she is able to perform the essential functions of that job, either with or without reasonable accommodation.  *Id.* at 135.  The term "essential functions" is not defined in the ADA, but ADA regulations say it means "the fundamental job duties of the employment position the individual with a disability holds or desires." 29 C.F.R. § 1630.2(n)(1); *accord Young v. Cent. Square Cent. Sch. Dist.*, 213 F. Supp. 2d 202, 212–13 (N.D.N.Y. 2002).

---

[7]  The elements of a Rehabilitation Act claim are "identical" to those in the ADA.  *Cain v. Mandl Coll. of Allied Health*, No. 14-CV-1729(ER), 2015 WL 3457143, at *4 (S.D.N.Y. May 29, 2015) (noting main difference is Rehabilitation Act requires that defendant discriminated solely on basis of disability, whereas ADA only requires that disability was motivating factor for discrimination).

To determine the essential functions of a position, court must conduct a factual inquiry into factors such as written job descriptions, amount of time on the job spent performing the function, how the job is actually performed in practice, etc. *McMillan v. City of New York*, 711 F.3d 120, 126–27 (2d Cir. 2013); 29 C.F.R. § 1630.2(n)(1) (listing non-exhaustive reasons job function may be considered "essential," i.e., position exists to perform that function, limited number of employees can perform that function, function is so highly specialized incumbent in position was hired for ability to perform that specific function).

The next step of the inquiry is to determine whether reasonable accommodations exist that can assist the plaintiff with performing that essential function. "In discrimination claims based both on adverse employment actions and on failure to accommodate, the plaintiff 'bears the burden of both production and persuasion as to the existence of some accommodation that would allow [her] to perform the essential functions of [her] employment.'" *Petrone v. Hampton Bays Union Free Sch. Dist.*, 568 F. App'x 5, 8 (2d Cir. 2014) (citation omitted). The ADA defines "reasonable accommodation" as including but not limited to "job restructuring, part-time or modified work schedules, [and] reassignment to a vacant position...." *Lovejoy-Wilson v. NOCO Motor Fuel*, Inc., 263 F.3d 208, 217 (2d Cir. 2001) (citing 42 U.S.C. § 12111(9)(B)).

i. *Intentional Discrimination*

Vega alleges that when she worked at P.S. 146 during the 2018–2019 school year, she used a motorized scooter and had trouble transporting her materials and completing her lesson plans before the 6 P.M. deadline. Doc. 31, 17. She claims that an accommodation to help her transport her materials was necessary to perform the essential functions of her job in that unrestricted access would "allow her to more easily transport her materials." *Id.* Vega specifically alleges that her inability to leave the school premises on time was not due to time management

14

issues, but because she often had to wait for the custodial staff to remove trash from the elevator so that she could leave. Doc. 36. And also, because she would be "forced to wander the halls" looking for assistance to leave the building. *Id.* She does not plead facts that lead to an inference that the 6 P.M. deadline or her difficulties exiting the building later were intentional acts of discrimination.

Furthermore, to the extent Vega alleges her termination in March 2019 was an intentional act of disability discrimination, then she has not alleged any facts that give rise to even a minimal inference of that. Doc. 45, 16–17. None of the reasons proffered by Estrella for terminating Vega mention her disability. Indeed, it is not clear that Vega even disputes the facts in Estrella's letter. Furthermore, Vega's conclusory remark that her termination was an act of retaliation for her accommodation requests is devoid of factual support. *See infra* Section D(b)(i).

### ii. Failure to Accommodate

Disability discrimination claims also include the failure to make a reasonable accommodation for the "known physical or mental limitations of an otherwise qualified individual with a disability" unless the employer can demonstrate that the accommodation would impose an undue hardship. *McBride v. BIC Consumer Prods. Mfg. Co., Inc.*, 583 F.3d 92, 96 (2d Cir. 2009). To establish a failure to accommodate claim under the ADA, "a plaintiff must establish that (1) [she] is a person with a disability; (2) defendant had notice of [her] disability; (3) plaintiff could perform the essential functions of the job at issue with reasonable accommodation; and (4) defendant refused to make such accommodations." *Kalola v. IBM*, No. 13 Civ. 7339(VB)(LMS), 2017 U.S. Dist. LEXIS 29945, at *42 (S.D.N.Y. Feb. 28, 2017) (internal quotations omitted).

Vega claims that while the administration and staff at P.S. 146 were well aware of her difficulties, they did not offer her "any sort of reasonable accommodation to allow her to more

easily transport her materials" for lesson planning. Doc. 31, 17. However, she does not state that she ever requested reasonable accommodation to help her transport her materials. *See Dooley v. Jet Blue Airways Corp.*, 636 F. App'x 16, 18–19 (2d Cir. 2015) (stating employer cannot refuse to make accommodation that it was never asked to make). Generally, it is the employee's responsibility to inform her employer that she needs an accommodation. *Ray v. Weit*, 708 F. App'x 719, 721 (2d Cir. 2017).

Instead, Vega alleges her "accommodation requests made while at P.S. 146 related to [her] ability to get in and out of the building." Doc. 48, 8. Specifically, that she requested a key so that she could come and go through the locked side door of the school without assistance, but that request was denied. *Id.* This request would have "allow[ed] [her] to better manage [her] time and leave the building prior to 6:00 p.m." Doc. 31, 17. She also claims that as a result of the school's refusal to give her a key, she received several reprimands for her late departures which contributed to the decision to terminate her. Doc. 48, 8. However, Vega acknowledges that from November 2018 to February 2019 she left the school shortly after dismissal. *Id.* She does not state that she had accessibility issues when she left on time. Accordingly, Vega has failed to show that the DOE's failure to accommodate her request for a key to the building was discriminatory. *See Krikelis v. Vassar Coll.*, 581 F. Supp. 2d 476, 486–87 (S.D.N.Y. 2008) ("[T]he Second Circuit has held that an employer is not required to provide every accommodation a disabled employee may request, as long as the accommodation provided is reasonable.") (citing *Fink v. N.Y. City Dep't of Pers.*, 53 F.3d 565, 567 (2d Cir. 1995)).

To the extent Vega alleges not being permitted to stay late in the school building constitutes a failure to accommodate, this claim must also fail. Doc. 49, 7. Vega noted that she could not leave the school on time because of garbage piled up in the elevator or because she could not

find staff to assist her through an accessible entrance. Doc. 36. The DOE argues that any accommodation was needed because of her inability to complete her work on time, not because of her disability. Doc. 49, 7. While Vega denies her time management was the issue, Doc. 36, she admitted in the Amended Complaint that she "was having difficulty completing her teaching and planning duties in time to leave the building as required" and claimed that reasonable accommodation to more easily transport her materials would have helped her with that. Doc. 31, 17. In sum, Vega has not shown a failure to accommodate.

### b.  Adverse Employment Actions Because of Disability

Similarly, Vega has not sufficiently plead that the adverse employment actions she suffered were because of her disability. A plaintiff sustains an adverse employment action if he or she endures a "materially adverse change" in the terms and conditions of employment. *Stalter v. Bd. of Co-op. Educ. Servs. of Rockland Cty.*, 235 F. Supp. 2d 323, 331 (S.D.N.Y. 2002). To be "materially adverse," a change in working conditions must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.* (citation omitted). A termination of employment, a demotion evidenced by decrease in wage or salary, less distinguished title, material loss of benefits, or significantly diminished material responsibilities, etc. can constitute a materially adverse change. *Id.* (citing *Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2d Cir. 1997)).

Here, Vega has alleged the following adverse employment actions:  (1) termination, (2) failure to accommodate disability, (3) disparate treatment than similarly situated employees, (4) retaliation, and (5) harassment. Doc. 31, 5. But she has not plead facts that suggest any of the complained-of employment actions occurred on the basis of her disability or that other

employees were treated differently than her. *See Gibbs v. City of N.Y.*, No. 02-CV-2424(LB), 2005 U.S. Dist. LEXIS 3169, at *26–27 (E.D.N.Y. Jan. 14, 2005).

### i. *Retaliation*

Vega alleges that her employment termination in March 2019 was retaliation for requesting reasonable accommodations. Doc. 31, 18. Termination is generally considered an adverse employment action *per se*. *Gibbs*, 2005 U.S. Dist. LEXIS 3169 at *26–27. The Court's inquiry is whether Vega has sufficiently plead that the discharge occurred under circumstances that give rise to an inference of discrimination based on her disability. *Id.* The reasons proffered for her dismissal included leaving P.S. 146 late, submitting a student's IEP late, using map with small text in the classroom, and her 2017 breakdown. Doc. 31, 17. Vega claims in a conclusory fashion that her termination was part of "an ongoing retaliation campaign stemming from her initial requests that the school system accommodate her disability." *Id.* at 18.

To establish a *prima facie* case of retaliation under the ADA, a plaintiff must show: "(1) [she] was engaged in an activity protected by [the applicable statute], (2) the employer was aware of that activity, (3) an employment action adverse to the plaintiff occurred, and (4) there existed a causal connection between the protected activity and the adverse employment action." *Palummo v. St. Vincent's Med. Ctr.*, 4 F. App'x 99, 102 (2d Cir. 2001). NYSHRL provides for the same standard. *See Mestecky v. New York City Dep't of Educ.*, 791 F. App'x 236, 238 (2d Cir. 2019). The standard is broader under the NYCHRL as plaintiffs need only show the retaliatory acts were "reasonably likely to deter a person from engaging in protected activity." N.Y.C. Admin. Code § 8-107.

A defendant can rebut a presumption of retaliation by articulating a legitimate, non-retaliatory reason for the adverse employment action. *Mestecky*, 791 F. App'x at 238 (citation

omitted). The burden then shifts back to the plaintiff to show that the defendant's proffered reasons were pretext and that "the desire to retaliate was the but-for cause of the challenged employment action." *Id.* To sufficiently plead causation, a plaintiff "must plausibly allege that the retaliation was a 'but for' cause of the employer's adverse action." *Vega*, 801 F.3d at 90 (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013)). To show causation indirectly by means of temporal proximity, the temporal proximity must be "very close." *See Clark Co. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001); *Galimore v. City Univ. of N.Y. Bronx Cmty. College*, 641 F. Supp. 2d 269, 288 (S.D.N.Y. 2009).

Here, to the extent that Vega alleges she was retaliated against for requesting a safety room during fire drills in 2018, a key to P.S. 146, and any other unidentified accommodations, she has not alleged that she engaged in a protected activity. Doc. 45, 21–22. As a threshold matter, courts in this Circuit have held that an activity comprising a plaintiff's failure-to-accommodate claim, cannot also constitute a protected activity such as that required in retaliation claims. *Snowden v. Trs. of Columbia Univ.*, No. 12-3095(GBD), 2014 U.S. Dist. LEXIS 42543, at *24 (S.D.N.Y. Mar. 26, 2014), *aff'd*, 612 F. App'x 7 (2d Cir. 2015); *see also Daley v. Cablevision Sys. Corp.*, No. 12-6316 (NSR), 2016 U.S. Dist. LEXIS 28885, at *22 (S.D.N.Y. Mar. 7, 2016) ("Plaintiff's ADA retaliation claim cannot be premised upon his request for an accommodation.").

Additionally, the alleged act of retaliation (termination in March 2019) occurred approximately six months after the alleged protected activities made on or around September 2018.[8] This large time gap fails the temporal proximity standard. *Murray*, 528 F. Supp. 2d at 275 ("[D]istrict courts within the Second Circuit have consistently held that the passage of two to

---

[8] The date of Vega's request for a key to P.S. 146 is unknown but presumably it occurred at or about the time Vega began working there in 2018. Vega alleges she made the request for a safety room during fire drills in September 2018.

three months between the protected activity and the adverse employment action does not allow for an inference of causation.")).  Lastly, to the extent that Vega alleges retaliation for filing this lawsuit in July 2018, she also fails to allege temporal proximity sufficient to establish a cause of action.  Thus, Vega has not met her burden of plausibly alleging retaliation based on disability.

### ii. Disparate Treatment

Similarly, Vega has not plead that she was subject to disparate treatment at P.S. 146.  She acknowledges that the rule about leaving the building by 6 P.M. applied to all teachers.  Doc. 31, 16.  *See Moore v. City of N.Y.*, No. 15 Civ. 6600(GBD)(JLC), 2017 U.S. Dist. LEXIS 379, at \*47 (S.D.N.Y. Jan. 3, 2017) (finding no plausible inference of discrimination where plaintiff did not plead facts about individual comparators or other specific evidence of disparate treatment, and thus, failed to raise his ADA claims beyond level of speculation).  Accordingly, Vega has not sufficiently plead disparate treatment.

### iii. Hostile Work Environment

To plausibly plead harassment led to a hostile work environment under the ADA, Plaintiff must allege the workplace was permeated with "discriminatory intimidation, ridicule, and insult" and that it was "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment."  *MacEntee v. IBM (Int'l Bus. Machines)*, 783 F. Supp. 2d 434, 445 (S.D.N.Y. 2011*), aff'd sub nom. MacEntee v. IBM*, 471 F. App'x 49 (2d Cir. 2012); *see Lee v. Colvin*, No. 15 Civ. 1472(KPF), 2017 U.S. Dist. LEXIS 16269, at \*38–39 (S.D.N.Y. Feb. 6, 2017) (Rehabilitation Act).  A plaintiff must plausibly allege that she was subjected to such conduct because of her disability.  *See MacEntee*, 783 F. Supp. 2d at 444–45.

Here, Vega makes conclusory allegations that she was harassed at work, specifically based on reprimands from Quinones (including a remark about Vega's health interfering with her

work), disciplinary letters issued to her, and disciplinary meetings held by Quinones.  Doc. 45, 20.  *See Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003) ("As a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.").  As discussed above, the claims against Quinones are dismissed pursuant to the election of remedies doctrine and because she is an individual to whom ADA and Rehabilitation Act liability does not apply.

Even if they were not barred, Vega does not allege, beyond conclusory statements that Quinones had "animus towards [her] due to her disability," that any of these incidents were due to any discriminatory animus.  "Stray remarks, even if made by a decision maker, do not constitute sufficient evidence to make out a case of employment discrimination" when they are not severe nor pervasive enough to alter the terms of employment.  *MacEntee*, 783 F. Supp. 2d at 445.  A plaintiff needs to show that the allegedly discriminatory incidents were "sufficiently continuous and concerted to have altered the conditions of [the employee's] working environment."  *Rasmy v. Marriott Int'l, Inc.*, No. 18-3260-CV, 2020 WL 1069441, at *6 (2d Cir. Mar. 6, 2020).  To analyze whether a plaintiff meets this burden, district courts consider "the totality of the circum-stances, including:  the frequency of the discriminatory conduct; its severity; whether it is physi-cally threatening or humiliating, or a mere offensive utterance; and whether it unreasonably inter-feres with the victim's [job] performance."  *Id.* at *4–6 (crediting allegations of numerous incidents of discriminatory harassment, i.e. employer calling employee "Egyptian rat," over three years).

Vega alleges that on or about February 2015 Quinones refused to give her an elevator key and said:  "Well Ms. Vega, I don't want you here.  I want you to go to 'open market' for a new job.  Your health is interfering with you doing your job."  Doc. 31, 11.  Quinones went on to point out that Vega was unable to accompany students on trips and walk students up the stairs to their

classes throughout the building, facts which Vega does not dispute.  *Id.*  In fact, on May 18, 2015, Vega herself asked to not be assigned to school trip duties because of her asthma and ongoing physical therapy.  Doc. 44-3, 9.  Based on the factual record, this utterance was not discriminatory, or severe, and occurred only once.  Vega also does not allege that this comment affected her job performance or that there were other similar comments.

To the extent that Vega alleges the negative performance reviews and disciplinary letters from Quinones resulted in a hostile work environment, those claims are insufficient without tangible consequences resulting from them.  Doc. 44-4, 4; *see Atkins v. Rochester City Sch. Dist.*, 764 F. App'x 117, 119 (2d Cir. 2019) ("A negative performance review, without more, does not constitute an adverse employment action."); *accord Chung v. city Univ. of New York*, 605 F. App'x 20, 22 (2d Cir. 2015), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006) (finding negative evaluation was not materially adverse where plaintiff did not assert detrimental effect on her salary, benefits, or title).  Vega does not allege tangible consequences stemming directly from the negative evaluations and letters.  While Vega's employment was terminated, this happened approximately two years after Quinones stopped being principal of P.S. 50 and while Vega worked at a different school.  Accordingly, Vega's claim of hostile work environment is denied.

## IV.    CONCLUSION

In sum, Defendants' motion to dismiss is GRANTED.  Furthermore, because Vega has not made a substantial showing of the denial of a constitutional right, no certificate of appealability shall issue.  The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal

from this Order would not be taken in good faith; therefore, in forma pauperis status is denied for purposes of an appeal. *See Coppedge v. United States*, 369 U.S. 438, 444–45 (1962).

The Clerk of Court is respectfully directed to terminate the motion, Doc. 42, terminate Quinones as a party, and close the case.

It is SO ORDERED.

Dated:　March 30, 2020
　　　　New York, New York

_____
Edgardo Ramos, U.S.D.J.